E-FILED
Tuesday, 29 March, 2016  10:57:11 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| FIDLAR ACQUISITION CO., d/b/a | ) | |
| FIDLAR TECHNOLOGIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 4:12-cv-04099-SLD-JEH |
| | ) | |
| FIRST AMERICAN DATA TREE LLC, | ) | |
| | ) | |
| Defendant/ | ) | |
| Third Party Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MICHAEL COSTELLO, in his official | ) | |
| capacity as the St. Clair County, Illinois | ) | |
| Recorder of Deeds, | ) | |
| | ) | |
| Third Party Defendant. | ) | |

ORDER

Fidlar Acquisition Co., doing business as Fidlar Technologies ("Fidlar"), sued First American Data Tree LLC ("Data Tree") to collect on an outstanding invoice for searches that Data Tree had conducted using Fidlar's software products and databases.  Data Tree impleaded Michael Costello, the Recorder of Deeds ("Costello" or "the Recorder") for St. Clair County ("St. Clair" or "the county"), with which Data Tree had originally contracted to gain online access to land records.  Fidlar and Costello now move for summary judgment against Data Tree, ECF Nos. 141 and 147 respectively, and Data Tree moves for summary judgment against both in return, ECF Nos. 146 and 145 respectively.  For the following reasons, Fidlar's and Costello's motions are GRANTED and Data Tree's DENIED.

This Order disposes of several other motions presently before the Court:  the Illinois Press Association's Motion for Leave to file an amicus brief in support of Data Tree, ECF No.

1

140, is GRANTED; Data Tree's Motion for Leave to File a Corrected Objection to the
Magistrate's March 17, 2015, ECF No. 113, is MOOT; Data Tree's Motion for Leave to File a
Reply Brief in response to Fidlar's response to that motion, ECF No. 131, is MOOT; Data Tree's
Motion for Judicial Notice, ECF No. 125, is MOOT; and finally, a separate Data Tree Motion for
Judicial Notice, ECF No. 143, is MOOT.  The reasons for the Court's rulings on these motions
are enumerated below.

## BACKGROUND[1]

Fidlar is a technology company that licenses its proprietary software to county recorders'
offices.  Fidlar's products let counties store land title records and metadata electronically, and
make both available via the internet.  Fidlar also provides storage and hosting services for this
purpose.

Data Tree aggregates land title information from across the country, and sells the
information to institutional and individual buyers like banks, surveyors, land development
companies, and real estate developers.  It also writes title insurance.

In 2009, Fidlar contracted with the Recorder to become the county's "software vendor."
Fidlar Mem. Supp. Mot. Summ. J. 2, ECF No. 142.  This meant that Fidlar licensed several
software programs to St. Clair in furtherance of the Recorder's official mandate to store and
make publicly available the records of title to land in St. Clair County.  The contract was a three-
year contract, which the county renewed in 2012.  As part of the contract, the county was
allowed to use Fidlar's iDocument ("iDoc") software, which scans and records documents in
electronic format.  iDoc also creates and associates with scanned files the "index data"—

---

[1] The facts recounted here are taken from the parties' agreed statements of fact.  Where a fact is disputed the dispute
is noted.

metadata specific to title records, including at a minimum the names of grantors and grantees of land.

Once Fidlar had contracted to be St. Clair's software vendor, St. Clair county employees started using iDoc to record title to land.  This means that usually, when someone presents the Recorder with a land title document, staff members review the document to make sure it meets the requirements for land title records in Illinois, stamp the document with a unique identifier called an "A number" (so called because it is a string of digits preceded by the letter "A," and not associated with any other title records held by St. Clair), scan the document into iDoc, enter index data to be associated with it, and return the original to its owner.  Title images and index data thus recorded are electronically stored on the Recorder's server, which is owned by the county and located in the same building.

However, the information does not remain there, or not only there, because St. Clair has also contracted with Fidlar to host its land title database and make the title information available over the internet.  To do so, St. Clair licensed Fidlar's "replication software," which copies the database from St. Clair's server to remote servers operated by Fidlar.  It also ensures that additions to and modifications of St. Clair's database propagate to Fidlar's servers in "near real time."  Fidlar's Mem. Supp. Mot. Summ. J. ¶ 47.  Once the data is on Fidlar's servers, Fidlar makes it available to the public via a few different software tools and under a variety of different pricing schemes.  In every instance, Fidlar acts as the county's agent; all parties agree that the county sets the fee structures that the end user must negotiate.  Each tool is linked to from St. Clair's website.

The county uses the following Fidlar products to transmit title information over the internet:

- **DirectSearch** allows people to search for and retrieve the county's index data, but not title record images themselves.  The user need not create an account to do so, and the service is free.  DirectSearch can be searched for parties' names, recorded date range, and document type.  It cannot be searched for A number.

- **Tapestry** is a more full-featured search program.  It allows users to search for and retrieve both St. Clair's index data and the record images themselves (and those of other counties).  The database is searchable for party name, A number, document type, date range, consideration amount, subdivision name, parcel number, metes and bounds parameters, township, range, or quarter.  In order to search, the user must first create an account and agree to Fidlar's Terms and Conditions.  Users must either pay before entering each search, pay at the end of the month for all searches executed, or prepay a certain amount that will then be credited toward the cost of searches.  By the terms of its contract with Fidlar, St. Clair must pay Fidlar $3.70 per search.  St. Clair chooses to set the cost of a search at $5.95, meaning that for each search, $3.70 belongs to Fidlar and $2.25 to St. Clair.

Each Tapestry search produces a results page and triggers the $5.95 fee, unless no results are found.  The search results, compiled in a table by title record, permit a user to view each record's index data for free, and to view the record image for free.  If a user wishes to print that image or save it to her computer, she must pay $0.50 a page.  The county's contract with Fidlar stipulates that 50% of all print fees belong to Fidlar.  The parties do not say whether, once a search result has been generated, it is possible to return to that results page free of charge, or whether a user must enter the same search parameters and

4

incur the $5.95 fee to view the search results once she has closed her browser window or otherwise stopped searching.

- **Laredo** is a search program with capacities similar to Tapestry (the parties do not specify whether and how its search capacities differ in their particulars). It is aimed at commercial users seeking a high volume of title information. It too provides access to both title images and index data. Unlike Tapestry, which is accessed via the web, Laredo users download client software to their own computers after creating user accounts and agreeing to a monthly fee structure. (Data Tree's description of the software suggests that it uses a subscriber's web browser to access the database.) The Laredo fees are organized by number of minutes per month spent searching, rather than number of documents accessed. Fidlar and St. Clair each get different cuts of the monthly subscription fee depending on what fee is paid. In Data Tree's case, the plan was for the maximum number of minutes per month—unlimited minutes. At this level, users pay $400 a month, of which Fidlar gets $115 and St. Clair $285.[2]

It is also possible for users to access Fidlar's servers, via the Laredo client, from seven public-use computer terminals at the St. Clair Recorder's office. People who use these terminals are not charged a fee. Fidlar and Costello claim that private users are not charged a fee if they wish to print records while searching from the terminals at St. Clair's office, and that only commercial users are charged a print fee of $2.00 per printed page. (Fidlar contests this assertion, but only to the extent that it argues the St. Clair's staff has no mechanism in place to verify the identity of searchers. *See* Data Tree Resp. Fidlar Mot. Summ. J. ¶ 157, ECF No. 170.)

---

[2] The parties also make mention of other Fidlar software products, Monarch and Property Fraud Alert, the first of which is a streaming online distribution system for new land records, and the second of which notifies clients if records are entered into St. Clair's title database that match records being "watched" by the client. Neither of these products is at issue in the present litigation.

Users can also, having identified a land record of which they wish to have a copy, email the Recorder's office and request a copy of the record free of charge; it lies within the Recorder's discretion to assess a fee or not, depending on whether the user is a commercial user. Sometimes the Recorder or his agent chooses to waive the fee even for commercial users. (The parties again disagree about the prominence with which this option for access is advertised on St. Clair's website, but not, apparently, that it is an option. Another portion of the Recorder's website confusingly declares that copies of records will not be provided by email.) The Recorder used also to provide weekly compact discs containing all new land records entered in a week, which interested parties could purchase; however, that process has been discontinued.

Fees for Tapestry searches are invoiced and collected by Fidlar. Fidlar discounts St. Clair's portion of these fees from what the county owes in monthly licensing costs and either remits the balance to St. Clair or bills it, depending on who ends up owing whom. In every month of 2012, the balance was in Fidlar's favor—licensing costs for its software outweighed search fees due St. Clair from Tapestry—so in every month of 2012, Fidlar billed St. Clair for licensing Tapestry. Laredo searches, on the other hand, are collected by St. Clair, which individually invoices each Laredo client.

Data Tree had had a relationship with St. Clair, and used Fidlar's various products to gain access to its title information, for several years prior to 2012. Its usual practice in determining how to acquire title information from a county was to have its in-house counsel review the options for accessing a county's records, and then proceed to collect the records by one of several means, including the use of computer programs that interfaced with counties' websites or search software to obtain title and index data very rapidly. In 2010, Data Tree lost access to a reserve of index data due to a corporate split, and had to devise a plan to re-acquire this data

6

from many counties, including St. Clair.  Data Tree rejected the CD-purchase method St. Clair operated at the time (too expensive), and also the use of DirectSearch (impossible to search by A number).  It developed a search program that could use Tapestry to gather the index data that it needed very rapidly, but rejected this method as being too costly.  Data Tree then learned about Laredo, and created an account which would allow Data Tree to get all the index data it wanted from St. Clair at the $400/month unlimited minutes option.  However, the team working on the data-gathering software was only told that unlimited access had been negotiated with St. Clair, not that this access came via a portal other than Tapestry.  Data Tree's Tapestry account was of the kind that allowed unlimited searching, followed by an itemized bill at the end of each month.

Assuming that they now had unlimited access via Tapestry, Data Tree's team set their program loose on St. Clair's index data, as well as that of a few other counties, with expensive results.  The program proceeded to execute over 68,000 individual searches at $5.95 per search. At the end of the billing period, Fidlar invoiced Data Tree for a Tapestry fee of $417,942.25. $404,719.50 of this was attributable to searches of title in St. Clair County.[3]  In April 2012, a representative of Fidlar called Data Tree to thank it for its business and see if Data Tree would like to pay in installments; Data Tree expressed its incredulity and refusal.  Fidlar remitted $153,045.25 to St. Clair—the county's cut of Data Tree's outstanding month of Tapestry searches—via a check dated September 10, 2012.  On September 17, 2012, Fidlar sued Data Tree to collect.

## DISCUSSION

### I.    Legal Standard on a Motion for Summary Judgment

---

[3] The parties have already settled the fees associated with non-St. Clair counties via motions pursuant to Federal Rule of Civil Procedure 68.  *See* ECF Nos. 114, 115.

Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation marks omitted).  A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997).  The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

The movant in a summary judgment motion bears the initial burden of production— pointing the court to the materials in the record that "demonstrate the absence of a genuine issue of material fact" for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the nonmovant bears the ultimate burden of persuasion on a particular issue, however, the requirements on the movant are "not onerous" and "may be discharged by showing—that is, point[ing] out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (internal quotation marks omitted).  Once the movant discharges her burden, the burden shifts to the nonmovant to "make a showing sufficient to establish the existence of an element essential to

that party's case." *Celotex*, 477 U.S. at 322. To satisfy this burden, a nonmovant must "go beyond the pleadings . . . to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor." *Modrowski*, 712 F.3d at 1169 (internal quotation marks omitted). "A plaintiff may not defeat the defendant's properly supported motion for summary judgment without offering any significant probative evidence tending to support the complaint." *Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1038 (7th Cir. 2006) (internal quotation marks omitted).

## II.    Analysis

Although the original claims, counterclaims, and third-party claims were numerous, they have been winnowed. Only two of Fidlar's initial claims remain, Counts III and IV of its First Amended Complaint, ECF No. 18, for breach of contract (III) and promissory estoppel (IV). Fidlar seeks the payment of the $404,719.50 it argues remains owing from Data Tree's expensive searches in March of 2012. Fidlar's Mem. Supp. Mot. Summ. J. 87. Data Tree seeks to avoid this payment by asking the Court to grant the requests for declaratory judgment contained in its Third Amended Counterclaim against Fidlar, ECF No. 110—namely, that the fees Fidlar charged for Tapestry use violate Illinois's Freedom of Information Act ("FOIA") (Count I), and the Illinois Counties Code ("ICC") (Count II). Data Tree makes the same claims for declaratory judgment in its Second Amended Third Party Complaint against Costello, ECF No. 109, in the same numbered Counts. For his part, Costello, who has not counterclaimed against Data Tree, argues that the FOIA and ICC claims contained in the Second Amended Third Party Complaint fail as a matter of law. Mem. Supp. Costello Mot. Summ. J. 18–19, ECF No. 147-1.

The Court has jurisdiction over these matters because the parties are diverse. 28 U.S.C. § 1332. The legal questions of statute and contract interpretation presented arise entirely under

Illinois law, so the Court must interpret and apply this law as the Illinois Supreme Court would do. *Liberty Mut. Fire Ins. Co. v. Statewide Ins. Co.*, 352 F.3d 1098, 1100 (7th Cir. 2003).

A point of clarification. Although Data Tree seeks declaratory judgments that the Recorder has violated the FOIA and the ICC, its purpose in seeking these judgments is to avoid enforcement of the contracts that, Fidlar and Costello assert, resulted in liability. Thus, although Data Tree does not clearly say so, it seeks to defend itself not by attacking the sufficiency of Fidlar's claims, but by asserting that the contracts it did in fact execute with Fidlar and St. Clair were illegal and should not be enforced. Illegality is a bar to the enforcement of a contract in Illinois, as elsewhere. *Ritacca v. Girardi*, 996 N.E.2d 236, 243 (Ill. App. 2013) (citing *McDonald v. Lund*, 43 P. 348 (1896)). *See D.C. Consulting Engineers, Inc. v. Batavia Park Dist.*, 492 N.E.2d 1000, 1003 (Ill. App. 1986) (explaining that when a municipal corporation is "utterly without power to make the contract in question," that contract is void). To claim that the St. Clair Recorder was without the legal authorization to make the sort of contracts he did, and that therefore the contracts should not be enforced, is thus to raise an affirmative defense. *See Instituto Nacional De Comercializacion Agricola (Indeca) v. Cont'l Illinois Nat. Bank & Trust Co.*, 576 F. Supp. 985, 988 (N.D. Ill. 1983) ("[T]he basic concept of an affirmative defense is an admission of the facts alleged in the complaint, coupled with the assertion of some other reason defendant is not liable.").

At summary judgment, a plaintiff seeking judgment on his claims as a matter of law must also show that there are no material factual disputes as to a defendant's properly-supported affirmative defenses, and he is entitled to judgment on his claim as a matter of law, the defenses notwithstanding. *See United Cent. Bank v. Wells St. Apartments, LLC*, 957 F. Supp. 2d 978, 987–88 (E.D. Wis. 2013), *reconsideration denied* (Oct. 17, 2013) ("It is therefore incumbent on

a defendant that wishes to prevent entry of summary judgment on the claim to come forward with evidence showing the existence of a genuine factual dispute concerning an affirmative defense that, if ultimately successful, would defeat the claim.").  So too, when a defendant moves for summary judgment on his affirmative defense, as he is entitled to do under Rule 56, he must show that there is no genuine dispute of material fact and that he is entitled to judgment on his defense as a matter of law.

Since Data Tree appears to concede that it entered into the roughly 68,000 contracts that produced its bill and this lawsuit, the Court will analyze its affirmative defenses under the FOIA and ICC.  *See* March 2012 Tapestry Invoice, Fidlar's Mem. Supp. Mot. Summ. J. Ex. 53; ECF No. 142.

### A.  Data Tree's FOIA Defense

Data Tree argues that the version of Illinois's FOIA in effect from 2011 until 2013 bars municipal entities from recovering any more than the cost of the storage medium used when responding to requests for public records.[4]  Mot. Amend. Mem. Supp. St. Clair Mot. Summ. J. 47–53, ECF No. 157-2.[5]  Fidlar and Costello respond that the FOIA does not govern the fees the county may charge for Tapestry searches because the more specific Uniform Real Property

---

[4] Data Tree also argues that the FOIA as amended in 2014 bars recovery for "voluminous requests" in excess of $100.  Data Tree Mem. Supp. Mot. Summ. J. 53–55; *see* 5ILCS 140/6(a-5).  The 2014 statute added a section providing fee schedules for "voluminous requests" of PDF (Adobe's popular Portable Document Format) and non-PDF documents.  However, Data Tree makes no argument about the retroactivity of this statutory addition; in the absence of such clarification or argument, the Court declines to consider the 2014 amendment when determining what it was lawful for St. Clair to do in 2012.  *See generally Landgraf v USI Film Products*, 511 U.S. 244, 269–70 (1994) (enunciating a test for retroactivity whereby a statute silent on its retroactive application is presumed not to apply retroactively if such application would impose a retroactive burden); *Commonwealth Edison Co. v. Will Cty. Collector*, 749 N.E.2d 964, 972 (Ill. 2001) (adopting the test for retroactivity enunciated in *Landgraf*).

[5] Citation to Data Tree's filings is complicated; its arguments in its motions for summary judgment against Fidlar and St. Clair are largely duplicative, and both were amended with the leave of the Court to make slight changes.  *See* ECF Nos. 149, 157, and the Court's Order of June 26, 2015, ECF No. 163.  Although the docket entries for Fidlar's motions for summary judgment remain the same, the memoranda supporting these motions are now to be found in the motions to amend.

Electronic Recording Act ("URPERA") and Counties Code apply.  Fidlar Resp. Data Tree Mot.

Summ. J. 135–36, ECF No. 167; Costello Resp. Data Tree Mot. Summ. J. 51–54, ECF No. 166.

Illinois's FOIA provided in 2012 that:

> When a person requests a copy of a record maintained in an electronic format, the public body shall furnish it in the electronic format specified by the requester, if feasible. If it is not feasible to furnish the public records in the specified electronic format, then the public body shall furnish it in the format in which it is maintained by the public body, or in paper format at the option of the requester. A public body may charge the requester for the actual cost of purchasing the recording medium, whether disc, diskette, tape, or other medium. A public body may not charge the requester for the costs of any search for and review of the records or other personnel costs associated with reproducing the records, except for commercial requests as provided in subsection (f) of this Section. Except to the extent that the General Assembly expressly provides, statutory fees applicable to copies of public records when furnished in a paper format shall not be applicable to those records when furnished in an electronic format.

5 ILCS 140/6(a).

Hanging its hat on two Illinois Appellate Court decisions, Data Tree argues that the FOIA

does not allow counties to charge a fee for electronic access to public land records in excess of

the cost of the recording medium.  Mot. Amend. Mem. Supp. St. Clair Mot. Summ. J. 51.  *See*

*Sage Info. Servs. v. Humm*, 977 N.E.2d 895 (Ill. App. 2012); *Sage Info. Servs. v. Suhr*, 10 N.E.3d

241 (Ill. App. 2014), *reh'g denied* (June 17, 2014), *appeal denied*, 20 N.E.3d 1262 (Ill. 2014).

But Data Tree misreads *Suhr* and *Humm*.

*Humm* held, and *Suhr* agreed, that a 2011 revision of the FOIA, which added the section

(a) cited above, had narrowed an exception in the statute that deferred to other statutory fee

schemes.  In *Humm*, the chief county assessment officer of Franklin County declined to fulfill a

FOIA request at only the cost of the electronic medium, relying instead upon a provision of the

Illinois Property Tax Code that allowed her to charge a "reasonable fee" beyond actual costs.

977 N.E.2d at 897.  The Circuit Court ruled in favor of the assessment officer, because an earlier

version of the FOIA had allowed any state statute that specified a different fee for access to

FOIA, whether for paper or electronic records, to control the stated FOIA rules.  The Appellate

Court found that that exception had been narrowed by the new section (a).  *See Suhr*, 10 N.E.3d

at 244 ("[S]ection 6(a) now governs electronic reproductions. And in doing so, it has narrowed

the exception to the cost-only rule.").  Henceforward, the court explained, FOIA's 6(a) exception

only applied to fee schedules for paper records that expressly applied to the provision of

electronic records as well.  *Id.* at 244–45; *see Humm*, 977 N.E.2d at 900 ("By its own terms, the

current version of section 6 of the FOIA does not allow a fee in excess of the cost of the

electronic medium for the reproduction of electronic records unless another statute expressly

provides that the fees for producing paper records also apply to electronic copies. Section 9–20

of the Property Tax Code does not so provide.").

Section 6(a)'s restriction of allowable fees to actual cost does not apply in the instant case

because, as Fidlar and Data Tree observe, there exist other statutes that expressly permit counties

to charge fees for electronic access to land title records.  The URPERA provides that a county

recorder "may provide for access to, and for search and retrieval of, documents and information

by electronic means, including the Internet, and on approval by the county recorder of the form

and amount, the county board may adopt a fee for document detail or image retrieval on the

Internet."  765 ILCS 33/4(b)(3).  And the ICC provides:

> If, but only if, a county provides free Internet access to public records maintained
> in electronic form, the county may charge a fee for the dissemination of the
> electronic data in bulk or compiled form, but the fee may not exceed 110% of the
> actual cost, if any, of providing the electronic data in bulk or compiled form.

55 ILCS 5/5-1106.1(c).  The parties disagree violently about whether or not Tapestry's search

features constitute "electronic data in bulk or compiled form," within the meaning of the ICC,

and the Court declines to resolve the question as explained *infra*, 18–20.  It is unnecessary to

13

reach a conclusion on that score, however, to determine from the existence of these two Illinois statutes that fees in excess of the cost-of-medium ceiling set by FOIA are authorized by other statutes and permitted by the FOIA.

First, and most obviously, 5 ILCS 140/6(a) provides only that, except as expressly provided by law, "statutory fees applicable to copies of public records when furnished in a *paper* format" shall not be applicable to electronic records production.  Neither the URPERA nor the ICC (or the portions at issue here) prescribe fees for access to *paper* records, as the statutes at issue in *Suhr* and *Humm* did.  Second, both URPERA and the ICC explicitly govern the fees that counties may charge for *electronic* access to land records.  Even had these statutes described fees for paper records as well, their express extension to electronic records would have fallen within the section 6(a) exception.  Third, the entire final sentence of 6(a) plainly countenances the existence of other, electronic-records-only statutory fee schedules, since it bothers only to explain the limited application to electronic records of fee schedules that might bear on them only remotely or by analogy.  If even paper records fee statutes may sometimes override the provisions of 6(a), then *a fortiori* electronic records fee statutes will do so.  Fourth, as both Fidlar and St. Clair observe, Fidlar Mem. Supp. Mot. Summ. J. 70, the FOIA's provisions with respect to electronic records fees are general, those of the URPERA and ICC, specific, and specific statutes in such contexts govern over general ones, as they have been held to do in FOIA prisoner cases in Illinois.  *See Lucas v. Prisoner Review Bd.*, 999 N.E.2d 365, 370 (Ill. App. 2013) (holding that DOC regulations and the Corrections Code, which were specific, overrode the FOIA's provisions "to the extent that [they] conflicted").

If the Tapestry fees at issue here were authorized under either or both the URPERA and the ICC, the FOIA's restrictions do not apply.  It is undisputed that the St. Clair County Board

14

adopted the Recorder's fee schedule, as provided by the URPERA. *See* Sprague Aff. ¶¶ 5–6, Fidlar Mem. Supp. Mot. Summ. J. Ex. 59, ECF No. 142-70; Suarez Aff. ¶ 4, Fidlar Mem. Supp. Mot. Summ. J. Ex. 60, ECF No. 142-71. Thus, the fee-limiting section of the FOIA, 6(a), does not apply to or render illegal the Tapestry fees St. Clair charged, and Data Tree cannot avoid its contracts on this basis.

### B. Data Tree's ICC Defense

Data Tree next argues that Fidlar and St. Clair have acted illegally beyond the remit provided them by either the URPERA or the ICC, because, with respect to the URPERA, the statute is so vague that it constitutes a "standardless grant of authority," Data Tree Resp. Fidlar Mot. Summ. J. 48; and because, with respect to the ICC, the Tapestry fees fail to meet the authorizing conditions of 55 ILCS 5/5-1106.1 in a number of ways, Mot. Amend. Mem. Supp. St. Clair Mot. Summ. J. 55–61. Fidlar and Costello reply that the Tapestry fees are authorized under both the URPERA and the ICC. Fidlar Mem. Supp. Mot. Summ. J. 74–81, Costello Mem. Supp. Mot. Summ. J. 21–27.

Because the Court finds as a matter of law that that the Tapestry fees are authorized under URPERA, as explained below, it does not reach the parties' arguments about the ICC.

Data Tree argues that URPERA, which provides that "the county board may adopt a fee for document detail or image retrieval on the Internet," 765 ILCS 33/4(b)(3), is so vague that it would be unconstitutional were it not constrained in its meaning by the fee-limiting language contained in the FOIA and ICC.[6] Mot. Amend. Mem. Supp. St. Clair Mot. Summ. J. 64. Fidlar

---

[6] Because it could be construed as calling into question the constitutionality of Illinois law, this conditional argument has elicited a flurry of filings from the parties, including Data Tree's Notice of Questioning State Statute's Constitutionality pursuant to Rule 5.1, ECF No. 171. Because the Court does not determine that any portion of the law is unconstitutional, the Court will not certify the question as otherwise required by Rule 5.1(b) and 28 U.S.C. § 2403. Illinos's Attorney General can suffer no prejudice by the Court's determination that her state's statute is constitutional. *See Dynamics Corp. of Am. v. CTS Corp.*, 794 F.2d 250, 260 (7th Cir. 1986) *rev'd on other grounds*, 481 U.S. 69 (1987) (applying a prejudice analysis to a district court's failure to certify a constitutional challenge to

argues that URPERA's grant of authority to set fees is not "standardless," but rather is guided

and constrained by the Illinois Electronic Recording Commission ("the Commission"), created

by URPERA and charged with promulgating standards that implement the Act.  Fidlar Resp.

Mot. Summ. J. 120.  Costello adds that URPERA postdates both the FOIA and ICC, and should

be construed as having been enacted harmoniously with those statutes, but also as having created

a distinct regulatory license for counties.  Costello Mem. Supp. Mot. Summ. J. 19–22.

       Data Tree characterizes the delegation of authority to county recorders' offices as being

unconstitutionally vague unless constrained by other statutory authority.  As the Illinois Supreme

Court has observed, however, in the case of comprehensive regulatory statutes such as URPERA,

where rule-making power is delegated to government agencies, delegated powers are always

conditioned by the other terms and conditions of the statute, and hence, the question is not

whether a statute is too vague, but whether it constitutes a delegation of legislative power so

extensive that it would violate section 1 of article II of the Illinois Constitution.  *Stofer v. Motor*

*Vehicle Cas. Co.*, 369 N.E.2d 875, 875 (Ill. 1977).  In *Stofer* and other decisions, the Illinois

Supreme Court "reappraised the constitutional limitations upon rule-making under a

comprehensive regulatory statute, and adopted as the criteria of validity that the statute

sufficiently identify the persons and activities subject to regulation, the harm sought to be

prevented, and the general means intended to be made available to prevent the harm."  *Rockford*

*Drop Forge Co. v. Pollution Control Bd.*, 402 N.E.2d 602, 606 (Ill. 1980).  *Accord Skinner v.*

*Mid-Am. Pipeline Co.*, 490 U.S. 212, 214 (1989)  ("[S]o long as Congress provides an

administrative agency with standards guiding its actions such that a court could ascertain

whether the will of Congress has been obeyed, no delegation of legislative authority trenching on

state statute and determining that where the state statute was not found by appellate courts to be unconstitutional, the
failure to certify was "not momentous").

the principle of separation of powers has occurred.").  The question for the Court, then, is whether 765 ILCS 33/4(b)(3) satisfies the *Rockford Drop* requirements for delegation of authority in Illinois, and whether St. Clair County acted in conformity with the statute in enacting the Tapestry fees.

The Court finds the fees were authorized, and that St. Clair County did act in conformity with the statute.  The statute identifies the persons and activities subject to regulation—county recorders and their adoption, along with county boards, of fees for document detail or image retrieval on the internet.  765 ILCS 33/4(b)(3).  It identifies the harm sought to be prevented—disharmony amongst Illinois counties' recording standards, inaccuracy in recording, and technological antiquation of Illinois's county clerks offices.  *Id.* 33/5(d).  And it identifies the means intended to be made available to prevent the harm—implementation of internet access to records for a fee.  Contrary to Fidlar's argument, the amount of the fee is neither standardless nor necessarily governed by the standards enunciated in unrelated statutes, but obviously and directly governed by URPERA's Commission, which has the power to implement binding standards by which the counties implement URPERA.  *Id.* 33/5(c).  The Commission is mandated to consist of stakeholders from lending institutions, the land title profession, and the counties, and must consider national standards, the needs of counties, the views of "interested persons and governmental officials and entities," and information technology security standards.  *Id.* 33/5(d). This is not a standardless grant of discretion, but rather one part of Illinois's legal grant of authority to the counties to set fees.

Next, the Court must determine whether the $5.95/search Tapestry fees were authorized according to the requirements of the statute.  The St. Clair County Recorder entered into a licensing agreement with Fidlar in 2009, and again in 2012.  *See* Computer System Software

17

License Sales Agreement, Fidlar Mem. Supp. Mot. Summ. J. Ex. 12; ECF No. 142-15.  The St.

Clair County Board authorized the licensing expenditures.  Costello Aff. ¶¶ 6–8, Fidlar Mem.

Supp. Mot. Summ. J. Ex. 28; ECF No. 142-31.

Fidlar does not seriously dispute that these actions satisfy the requirements of 765 ILCS

33/4(b)(3); rather, it argues that the statute itself must be construed as prohibiting the Tapestry

fees if it is to be construed as constitutional.  However, the statute is not an excessive delegation

of power, and in approving and then charging the $5.95/search Tapestry fee, St. Clair County

complied with it.  As the United States Supreme Court has noted in discussing the federal

nondelegation doctrine, "Private rights are protected by access to the courts to test the

application of the policy in the light of these legislative declarations."  *Skinner*, 490 U.S. at 219

(quoting *Am. Power & Light Co. v. Sec. & Exch. Comm'n*, 329 U.S. 90, 105 (1946)).

Furthermore, the Court agrees with the Recorder that it makes sense to construe

URPERA as harmonious with but distinct from the FOIA and the ICC, which already existed

when URPERA was enacted.  URPERA is a comprehensive real property electronic recording

statute.  The FOIA sets standards for general and bulk data requests for all kinds of public

documents, and continues to be updated alongside URPERA to reflect the changing

technological landscape.  The ICC gives counties the general power to make public records

available online, stipulating that they must be freely available to the public unless in "bulk or

compiled form."  URPERA, by contrast, sets up a governing Commission to implement all of

URPERA's aspects, and impliedly gives the Commission control over what fees are reasonable

for counties to set for access specifically to land records in light of all the factors it is mandated

to consider.  Although 765 ILCS 33/4(b)(3) does not set a "ceiling" on fees in the way that the

FOIA or ICC do, it is particularly tailored to the high-volume realities of electronic land

recordation.  Unlike the other two statutes, it expressly countenances "search and retrieval."  It distinguishes between document detail and image retrieval, as do the various software solutions St. Clair has contracted with Fidlar to put in place.  It is this Court's duty to interpret Illinois's laws, as much as possible, as harmonious with preceding statutes and neither redundant with nor contradictory of them.  *See Illinois v. Mikusch*, 562 N.E.2d 168, 170 (Ill. 1990) ("The fundamental rule of statutory construction . . . is to give effect to the intent of the legislature . . . . It is presumed that the legislature, in enacting various statutes, acts rationally and with full knowledge of all previous enactments.").  Such a construction dictates the conclusion that URPERA expressly and narrowly authorizes counties, subject to the Commission, to set fees for access to land records that are not otherwise  authorized by the ICC and the FOIA.

Because St. Clair's search fees were not illegal under the FOIA, and were authorized by the URPERA, the contracts formed between Fidlar, acting as St. Clair's agent, and Data Tree, in enacting the Tapestry searches, were legal.  Data Tree's affirmative defenses fail, as do Data Tree's claims for declaratory judgment.  Because the Tapestry contracts were authorized under the URPERA, the Court will not address the parties' arguments about whether they were authorized under the ICC's "bulk or compiled form" exception.  Because the contracts Data Tree entered into with Fidlar were otherwise valid, Fidlar is entitled to judgment in the full amount of all of the contracts with Data Tree—$404,719.50.

While this is undeniably a large sum of money, to the extent that under other circumstances it would suggest defenses of substantive unconscionability, under these circumstances it is proportionate with the commercial sophistication of the defendant and the scope of its record-harvesting operation.  *See Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 267 (Ill. 2006) (defining substantive unconscionability in a class-action arbitration case as

broadly concerning "the actual terms of the contract and examin[ing] the relative fairness of the obligations assumed."). Data Tree could have acquired the information it sought at a fraction of the price; the size of the bill in this case represents not the extortionate magnitude of St. Clair's $5.95/search fee structure, but Data Tree's remarkable capacity to incur via software, 68,000 times, a fee directed at the occasional uses of ordinary humans.

### C. Remaining Motions

The Illinois Press association filed a motion for leave to file an amicus brief in support of Data Tree. Neither Data Tree nor Fildar objected, although Costello did. *See* Fidlar Response Mot. Amicus Curiae, ECF No. 160; Costello Resp. Mot. Amicus Curiae, ECF No. 143. "Whether to permit a nonparty to submit a brief, as amicus curiae, is, with immaterial exceptions, a matter of judicial grace." *Nat'l Org. for Women, Inc. v. Scheidler*, 223 F.3d 615, 616 (7th Cir. 2000). Grace is here extended; the Court has read and considered the Illinois Press Association's brief.

Data Tree's Motion for Leave to File a Corrected Objection to the Magistrate Judge's ruling seeks review of the Magistrate Judge's March 17, 2015 Order excluding the testimony and evidence of Karl Idsvoog and Sarah Sexton. Idsvoog and Sexton contacted Costello's office seeking free land records and were reportedly rebuffed. Objection 3, ECF No. 113-2. Because whether or not Idsvoog and Sexton were able to obtain land records for free from St. Clair is material only to arguments about whether St. Clair's fee practices are legal under the ICC, which the court did not reach, the Objection is moot. Data Tree's motion to continue the fight over the matter in a reply to Fidlar's Response is similarly moot.

Data Tree's first Motion for Judicial Notice, ECF No. 125, asks the Court to take judicial notice of land record access fees in other Illinois counties and on Fidlar's website. The

information did not impact the Court's resolution of the pending motions; the motion is moot. So too is Data Tree's motion to introduce court records from the '90s.

## CONCLUSION

Accordingly, Plaintiff Fidlar's Motion for Summary Judgment, ECF No. 141, and Third-Party Defendant Michael Costello's Motion for Summary Judgment, ECF No. 147, are GRANTED, and Defendant Data Tree's Motions for Summary Judgment, ECF Nos. 145 and 146, are DENIED.  The Illinois Press Association's Motion for Leave to file an amicus brief in support of Data Tree, ECF No. 140, is GRANTED; Data Tree's Motion for Leave to File a Corrected Objection to the Magistrate's March 17, 2015, ECF No. 113, is MOOT; Data Tree's Motion for Leave to File a Reply Brief in response to Fidlar's response to that motion, ECF No. 131, is MOOT; Data Tree's Motion for Judicial Notice, ECF No. 125, is MOOT; and finally, the separate Data Tree Motion for Judicial Notice, ECF No. 143, is MOOT.  Data Tree's counterclaims against Fidlar and its third-party claims against Costello are DISMISSED.  No further claims remaining, the Clerk shall enter judgment for Fidlar in the amount of $404,719.50, plus costs and prejudgment interest, and close the case.

Entered this 29th day of March 2016.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE